[No. 2401.]

James Jones *v.* The State.

1. Murder—Evidence—Declarations of a defendant subsequent to the
commission of the offense, if wanting in spontaneity and instinctive-
ness, and are but the party talking about the facts, and not the facts
speaking through the party, form no part of the *res gestœ*, but are self-
serving declarations, and as such are properly rejected as evidence.
2. Same—Charge of the Court in a murder trial properly omits the law of
manslaughter in the absence of evidence mooting that degree of homi-
cide. Note the statement of the case for evidence which fails to present
the issue of self defense, and therefore the defendant can not be heard to
complain of the charge upon that issue, in as much as it enured to his
benefit.
3. Same—Fact Case.—See the statement of the case for evidence *held* suf-
ficient to support a capital conviction for murder.

Appeal from the District Court of Bowie. Tried below be-
fore the Hon. W. P. McLean.

The death penalty was assessed against the appellant by the
jury, which found him guilty in the first degree under an indict-
ment which charged him with the murder of Cate Hicks, in
Bowie county, Texas, on the sixth day of August, 1886.

Vic Simpson was the first witness for the State. He testified
that he knew the defendant and was acquainted with the de-
ceased in his lifetime. The defendant was a tie cutter in the
employ of the Texas and St. Louis railroad and was attached to
the gang at work near Bossett, in Bowie county, on August 6,
1886. The deceased was the cook for the gang. The witness
saw the defendant kill the deceased on the said August 6. De-
fendant did not go to work on that day, but remained in camp.
While the deceased was engaged in preparing dinner on that day
the defendant went into the kitchen and got a cup of water and
started out with it. Deceased told defendant not to take the
water out of his cook room; that he needed it to cook with and
had to go a long way to get it. Defendant replied that he did
not care how much deceased needed it or how far he had to go
to get it, and that as he wanted the water he was going to take

it, as some of the hands who did not drink coffee had to have water. Deceased replied that he was the cook and had the right to control his cook room and everything it contained. Defendant left the cook room with the water and shortly returned with a cocked revolver in his hand. He walked up to deceased, cursed him and asked if he did not like the way he took the water. Deceased replied that he did not like it, when defendant struck him over the head with his fist, knocking the deceased's hat off. Deceased retreated backwards, followed by the defendant, who punched him in the face with the pistol. Deceased continued to retreat backwards, defendant following and keeping between the deceased and the cook room door, and cursing him, with the pistol leveled at his face. Deceased backed until his retreat was stopped by the foot of a bunk sitting up against the wall of the cook room. An empty gun was then standing against the wall near the bunk. The bunk was about waist high. Deceased, with his face still towards the defendant, put his right arm on the bunk, his arm from the elbow resting on the bunk, which threw his hand beyond the empty gun. The defendant called to deceased: "Don't put your hand on that gun," and fired, shooting the deceased immediately over the left eye. Deceased fell dead, his brains running out of the wound. The movement of his hands to his face, when shot, brought the barrels of the gun in his embrace. The witness knew it to be a positive fact that the deceased did not have hold of the gun when defendant shot him. After shooting the deceased the defendant walked to the door and said: "I have shot that d—d son of a b—h's brains out and if there is anybody here who wants to take it up I will shoot their d—d brains out. I told him to put down that gun. I did not know what route he would take with it on me." The witness knew that the deceased was aware of the fact that the gun was not loaded, and that there was no ammunition in camp with which it could be loaded. He saw the defendant, not more than thirty minutes before the shooting, examine the gun, and heard him ask for ammunition, and heard him told that there was no ammunition in camp. It was the defendant himself who, when he found the gun unloaded and that no ammunition was accessible, set the gun by the bunk where it was when he killed the deceased. From the time that he examined the gun until he killed the deceased the defendant was in and out of the cook room, and saw that the deceased was busy cooking dinner. The deceased and

the gun fell together, the gun partly under the body, whence it was pulled by the witness. Defendant did not run off. He came to town with the witness and others, and surrendered to the sheriff.

Mose Walker testified, for the State, that he saw the dead body of Cate Hicks a short while after the shooting. He saw the defendant a short time before the killing. Defendant then had a pistol in his hands, flourishing it about. Witness did not think that defendant meant anything serious by that conduct, until, walking up to defendant, he saw that the pistol was cocked and loaded all around. Witness advised defendant to put the pistol away or he might kill somebody; to which he replied that he was going to kill some d—d nigger about there anyhow. He did not threaten to kill any particular negro.

Bill Daniels testified, for the State, that he was present and witnessed the killing of Cate Hicks by the defendant in the tie camp in Bowie county, Texas, on the sixth day of August, 1886. While the deceased was preparing dinner for the tie cutters on that day, the defendant walked into the cook room and took a cup of water, and started out. Deceased called to defendant, telling him not to take the water out of his cook room; that he required it in his cooking, and had to go a long distance to get it. Defendant replied that he did not care, and went out with the water. He shortly returned to the cook room with a cocked revolver in his hand. He walked up to the deceased, who was then cooking dinner; cursed him, and asked him if he did not like the way he took the water. Deceased replied that he did not, whereupon the defendant struck him over the head with his fist, and slapped his hat off. Deceased backed off, the defendant following and cursing him, keeping himself between the deceased and the door of the cook room. Deceased, followed by the defendant, backed until he reached a bunk attached to the wall of the cook room, beyond which he could not go. The bunk was about waist high. An empty gun stood against the bunk, the butt end resting on a pile of shavings on the floor, which threw the muzzle about to the level of a man's head. When he backed against the bunk, the deceased threw his hand back and caught hold of the gun. Defendant ordered the deceased to take his hand away from the gun. Deceased did so, and defendant fired, shooting deceased through the head, the ball entering just over the left eye. Deceased fell dead, the gun falling with him. Witness saw and knew that the deceased

removed his hand from the gun when ordered to do so by the defendant. The fatal shot was fired at very close quarters. After shooting the deceased, the defendant walked out of the cook room, and said that he had shot that d—d son of a b—h's brains out, and that if any body wanted to take the matter up he would shoot their d—d brains out. The defendant knew that the gun in the cook room was not loaded. He examined it, not exceeding thirty minutes before the shooting, and saw that it was empty. He asked for and failed to get ammunition to load it, because there was none in camp. He himself placed the gun where it was when he shot the deceased.

Crawford Jimmerson testified, for the State, that he did not see the shooting, but heard the report of the pistol when it was fired. A few minutes before the fatal shot was fired, he saw the defendant with a cocked revolver, flourishing it around, and heard him say that he was going to kill some d—d nigger at that camp any how. He mentioned no particular negro, but was mad with the witness at that time, and cocked the pistol on him. The State closed.

Mark Copeland was the only witness for the defense. He testified that he was asleep in a tent about fifty yards from the scene of the killing when it occurred. He knew nothing of the tragedy until he was awakened and informed that the defendant had killed Cate Hicks. He went immediately to the scene of the killing, and found the deceased still breathing, and a large crowd collected. Five, ten or perhaps fifteen minutes had elapsed since the shooting. Witness asked defendant why he killed the deceased. The court sustained the State's objection to the answer of the defendant, as being a self serving statement and no part of the *res gestæ*. Continuing, the witness said that defendant went with others to Texarkana on the same day, and surrendered to the sheriff.

The motion for new trial raised the questions discussed in the opinion.

*J. J. King* and *A. W. Vaughan*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. It was not error to reject the declarations of the defendant as to why he did the killing. They did not come within the rule of *res gestæ*. They were not *sponta-*

*neous*, but were concocted, self serving declarations; not the *facts* talking through the party, but the party's talk about the facts. They were wanting in the essential characteristic of *instinctiveness* to make them a part of the *res gestæ*. (Bradberry v. The State, *ante*, 273; Whart. Cr. Ev., sec. 691.) Their truth was disproved by all the evidence in the case.

II. There is no error in the charge of the court. It presented to the jury fully, clearly and correctly all the law applicable to the facts of the case. It was more liberal to the defendant than the evidence demanded. It might very well have omitted any instructions as to self defense, that issue not having been fairly raised by the proof. The issue of manslaughter was not presented by the evidence, and hence it was not error to fail to charge the law of that offense.

III. The conviction is amply sustained by the evidence. There is no room to doubt that defendant committed the murder, and that he was actuated by express malice. It was a deliberate homicide, unprovoked and without mitigation. It is but justice that he should suffer the extreme penalty of the law, and the judgment is affirmed, there being no reason appearing to us why it should be set aside.

*Affirmed.*

Opinion delivered November 17, 1886.